# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 06-0322


**ALBERT HARPER**

**VERSUS**

**GRAND CASINO COUSHATTA**


\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION, DISTRICT 3
PARISH OF CALCASIEU, NO. 02-04437,
HONORABLE SAM LOWERY,
WORKERS' COMPENSATION JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

**JIMMIE C. PETERS**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Chief Judge Ulysses Gene Thibodeaux and Judges Jimmie C. Peters and J. David Painter.

**AFFIRMED.**


**Michael V. Matt**
**Attorney at Law**
**Post Office Drawer 191**
**Eunice, LA 70535**
**(337) 457-8260**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Albert Harper**

**Jeffrey J. Warrens**
**Johnson, Stiltner & Rahman**
**Post Office Box 98001**
**Baton Rouge, LA 70898**
**(225) 231-0652**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Grand Casino Coushatta**

**SUMMARY DISPOSITION**

PETERS, J.

Albert Harper appeals the dismissal of his workers' compensation claim which was based on allegations of mold-induced disease contracted during the course and scope of his employment with Grand Casino Coushatta (Casino). Essentially, Mr. Harper's appeal involves a manifest error review, and, as we find no manifest error in the judgment below, we affirm.

Mr. Harper began working for the Casino in December of 1995 in maintenance. During the course of his job duties, Mr. Harper was exposed to mold that had infiltrated the walls of the Casino's hotel. According to Mr. Harper, during the course of his employment with the Casino, he began experiencing various symptoms from the mold exposure, including fatigue, nose bleeds, sinus problems, "watery" eyes, memory and concentration problems, ringing in his ears, muscle weakness, and coughing. He discontinued working at the Casino on March 2, 2002, and filed the instant claim after the Casino failed to pay him any workers' compensation benefits.

The matter proceeded to a hearing on May 9, 2005, at which time Mr. Harper claimed to still be experiencing symptoms despite the fact that he had not returned to work after March 2, 2002. The workers' compensation judge (WCJ) found in favor of the Casino and dismissed Mr. Harper's claim. In so doing, the WCJ gave the following reasons for judgment, which we quote in relevant part:

> The medical aspect of the instant matter focuses on the controversial and much-litigated issue involving mold induced disease. More specifically, the issue at trial was whether the physical symptoms complained of by Mr. Harper are related to his exposure to mold during his employment at the casino.
>     There was a wide divergence in the medical opinions offered by the physicians in this case, a situation not uncommon in litigation involving occupational disease. Doctors who disagree are part of the disability landscape. But in the instant matter, there was disagreement by physicians not only as to the physiological aspects of the patient, but

there was also lack of agreement as to the efficacy of the medical science which was used to evaluate the patient. The Court is accustomed to evaluating the credibility of witnesses and, in more cases than not, that's a significant factor in making a decision regarding a workers' compensation claim. But in this situation, the court is obliged to take into account - some degree at least - also the credibility of the science used by the medical evaluator. Simply - probably too simply - put, all doctors clearly do not reach for the same medical textbook when they are faced with a toxic mold question. In addition, each side took special pains to point out the perceived general failures and shortcomings of each other's medical experts.

. . . .

Mr. Harper's argument is rather straightforward. In essence, he says that before he went to work at the casino removing wallpaper and sheetrock which had been damaged by water infiltration and upon which mold was visibly growing, he was a healthy, hard working individual. After this exposure, he argues, he was beset with a variety of serious physical symptoms, mostly involving pulmonary problems.

The casino, on the other hand, argues that the claimant's medical problems are unrelated to his employment. Mr. Harper testified that he began to experience health problems in late 2001, some six years after he began working for the casino in 1995. From all accounts, most of the time he was involved with the defendant . . . he was repairing moisture damaged walls in the hotel portion of the gaming facility.

Mr. Harper sought treatment from Dr. Luke Williams, a pulmonologist, on October the 30th, 2001 who, after examining and testing him, diagnosed him as . . . suffering from an allergic rhinitis and mild obstructing lung disease which he felt was probably emphysema. The medical records indicated that Mr. Harper told Dr. Williams that he had smoked at least two packs a day for most of his life, as he put it, and had a persistent cough which had worsened over the previous year. The medical reports from Dr. Williams show that he did not relate Mr. Harper's condition to his employment, but he did suggest, as he put it, he could not rule out [an] association with a fungal process.

He was next seen by Dr. Brian Wilder, who practices internal medicine, on . . . March the 1st and March the 19th of 2002 who diagnosed him as suffering from acute bronchitis and acute sinusitis with chronic irritation symptoms. And Dr. Wilder also commented that the condition could probably be related to mold exposure.

He was then seen by Dr. Andrew Campbell on March the 28th, 2002 who ordered a series (the defense used the term "multitude") of tests. He returned to his office on May the 14th, 2002 and was seen by Dr. William High, a neurologist, whose capacity was not made clear at the trial but appeared to be associated with Dr. Campbell. At any rate, Dr. High opined that Mr. Harper showed signs and symptoms of peripheral neuropathy and restless leg syndrome. I find no mention in Dr. High's report of any suggestion that any of Mr. Harper's medical problems [were] caused by mold exposure. The defense attorney made

the point, but did not dwell on it, that these two office visits and the tests generated medical charges in the amount of $14,767. The suggestion hung heavy in defense counsel's language that Dr. Campbell's customary billing and testing procedures [have] earned him the careful, appropriate, and critical attention of the Texas State Board of Medical Examiners. Over the claimant's objection, I permitted the complaints filed against Dr. Campbell in these other cases to be admitted, but I want to make it clear that I consider this evidence to be nothing more than informational, certainly not dispository, because I was not shown Dr. Campbell's rebuttal, if he had any, to these patient[s'] complaints.

During the period between his visits to Dr. Campbell's office, Mr. Harper returned to Dr. Wilder who told him that the sinusitis and bronchitis [were] probably related to some exposure to mold at his work site.

Within the next few months, on July the 16th, 2002, Mr. Harper was evaluated by Dr. Eric Comstock, a physician specializing in medical toxicology. Dr. Comstock reviewed the available medical records and performed his own examination and testing. His conclusion was that in reference to Mr. Harper's pulmonary complaints, the chest X-rays were normal. Pulmonary function studies were mildly abnormal, with the abnormalities being consistent with what a physician expects to see in individuals who have smoked two packs of cigarettes a day for well over 30 years.

Dr. Comstock testified at length with the science of mold and its potential effects on the human system. Focusing on the specific factual circumstances of Mr. Harper, he stated he believed that whatever exposure to mold Mr. Harper had was not sufficient to result in any type of systemic toxic exposure response. Dr. Comstock's testimony was explicit, detailed, and thoroughly unambiguous. He could not have been more clear in his view that Mr. Harper suffers from allergic chronic rhinosinusitis, but that this malady was not . . . the result of some mold induced disease. Rather, he said Mr. Harper suffers from allergic chronic rhinosinusitis and other pulmonary function abnormalities associated with his medical history.

Corroborating Dr. Comstock's opinion was Dr. William Nassetta, an occupational medical disease specialist, who stated that "The fact that Mr. Harper continues to be . . . symptomatic outside the workplace, despite the removal from the purported allergen is inconsistent with exposure to mold." Dr. Nassetta concluded that, "At the most, Mr. Harper may have need to be restricted from areas that aggravated his allergy symptoms temporarily."

Both of these physicians are also in total agreement that the rather unorthodox testing and treatment by Dr. Campbell had little value. As an aside, I am not unmindful of the fact that Dr. Nassetta was chosen . . . and paid for by the defendant's insurer.

. . . .

A careful review of the testimony shows that Mr. Harper failed to establish causation by a preponderance of the evidence. Dr. Campbell's

opinion is questionable at best and lacks medical . . . evidence, evidence which was generated at his request. Although Dr. Comstock and [Dr.] Nassetta are in agreement that Mr. Harper's complaints of sinusitis and rhinitis are consistent with one suffering allergic reaction to an irritant, Mr. Harper's claim of continued symptomatology, despite his long-term removal from the casino, would break any causation chain. If, in fact, Mr. Harper's initial complaints were precipitated by his work at the casino, medical evidence suggests his symptom complex would have dissipated shortly after March the 2nd of 2002, his last day of work at the casino.

. . . .

Even viewed in a light most favorable to the plaintiff or claimant, the medical evidence in this case simply does not support the assertion that any symptoms suffered by Mr. Harper are related to his work at the casino. He has failed to carry his burden of proof in this regard.

In order for an appellate court to reverse a fact finder's factual determinations, the appellate court must find that a reasonable factual basis does not exist in the record for the finding and that the record establishes that the finding is clearly wrong or manifestly erroneous. *Stobart v. State, through Dep't of Transp. & Dev.*, 617 So.2d 880 (La.1993). Moreover, "[t]he rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound." *Lirette v. State Farm Ins. Co.*, 563 So.2d 850, 853 (La.1990).

In the instant case, the WCJ chose to credit the expert opinions of Dr. Comstock and Dr. Nassetta, and we find no basis for rejecting the reasons of these experts as being patently unsound. Having reviewed the record as a whole and having accepted the WCJ's decision to credit the expert opinions of Dr. Comstock and Dr. Nassetta, we do not find that the WCJ was clearly wrong in rejecting Mr. Harper's claim for benefits. Therefore, we affirm the judgment below. Because we affirm the judgment below, it is unnecessary for us to consider Mr. Harper's remaining assignments of error.

## DISPOSITION

For the foregoing reasons, we affirm the judgment below and assess costs of this appeal to Albert Harper.

**AFFIRMED.**

We affirm the judgment below in a summary disposition in accordance with Uniform Rules—Courts of Appeal, Rule 2-16.2(A)(5), (6), and (8).